IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JOHN SLAUGHTER,                    §
                                   §
        Plaintiff,                 §
                                   §
v.                                 §          CIVIL NO. H-10-3832
                                   §
MICHAEL J. ASTRUE                  §
COMMISSIONER OF THE                §
SOCIAL SECURITY ADMINISTRATION,    §
                                   §
        Defendant.                 §

<u>**MEMORANDUM OPINION**</u>

Pending before the court[1] are Defendant's Motion for Summary Judgment (Doc. 9) and Plaintiff's Motion for Summary Judgment (Doc. 17).  The court has considered the motions, all relevant filings, and the applicable law.  For the reasons set forth below, the court **GRANTS** Defendant's motion and **DENIES** Plaintiff's motion.

**I.  Case Background**

Plaintiff filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of an unfavorable decision by the Commissioner of the Social Security Administration ("Commissioner") regarding Plaintiff's claim for disability benefits under Title II supplemental security income under Title XVI of the Social Security Act ("the Act").

**A. <u>Factual History</u>**

---

[1]     The parties consented to proceed before the undersigned magistrate judge for all proceedings, including trial and final judgment, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. Doc. 15.

Plaintiff was born on January 20, 1962, and was thirty-nine years old on August 15, 2001, the date of the alleged onset of disability.[2]   Plaintiff completed high school.[3]   Prior to his alleged onset of disability, Plaintiff worked as a truck driver and a mail carrier with United States Postal Services.[4]

### 1. Mental Illness

The medical record generally supports Plaintiff's claims of a mental disability.  The onset of Plaintiff's mental illness dates back to November 1993.[5] At that time, Plaintiff's mother took Plaintiff to the emergency room at Twelve Oaks Hospital where he was admitted and treated for an acute psychotic episode.[6]  He was diagnosed with Axis I psychosis not otherwise specified ("NOS") and exhibited Axis IV severe psychosocial stressors.[7]   His global assessment of functioning ("GAF") score was thirty-five.[8]   Upon discharge, Plaintiff was advised to take medication and report for outpatient treatment.[9]

---

[2]      See Transcript of the Administrative Proceedings ("Tr.") 128, 135.

[3]      See Tr. 31, 46, 153, 330.

[4]      See Tr. 33, 55, 150, 166.

[5]      See Tr. 315-28.

[6]      See Tr. 317,319-20.

[7]      See Tr. 320.

[8]      Id.

[9]      See Tr. 321.

Plaintiff was next hospitalized at Ben Taub Hospital in January 1998, where he was diagnosed with a mood disorder NOS[10] and tested positive for cocaine, cannabis, and PCP.[11] A few weeks later in February 1998, Plaintiff was hospitalized after Houston police found him walking naked down the street.[12] His mother told Harris County Social Services that Plaintiff had been digging up stop signs looking for gold, talking to and hearing voices, and walking into traffic.[13] Plaintiff tested positive for marijuana and was diagnosed with psychosis NOS.[14] He was involuntarily committed to the Harris County Psychiatric Center ("HCPC") where he was treated and discharged.[15] HCPC treated Plaintiff again in December 1999 for substance-induced psychosis and designated Plaintiff with a GAF score of twenty-five.[16] At the time, Plaintiff did not test positive for any substances, but in light of his medical history, the attending psychiatrist recommended that he attend a twelve-step program.[17]

---

[10]   See Tr. 228.

[11]   See Tr. 232.   PCP is the street name for the recreational drug phencyclidine

[12]   See Tr. 211.

[13]   See Tr. 217.

[14]   See Tr. 215, 219.

[15]   See Tr. 345-360.

[16]   See Tr. 333-43.

[17]   See Tr. 333, 343.

On August 15, 2001, Plaintiff was involuntarily admitted to HCPC after Houston police found him in a parking lot setting things on fire.[18]  He was "loud, agitated, talking about 'kicking demons' out of his house, [and] hearing voices."[19]  Plaintiff admitted to using cocaine, PCP and alcohol, and to being noncompliant with his medications.[20]  At the time of admittance, he was diagnosed with substance-induced psychosis with a GAF score of twenty.[21]  Upon discharge, Plaintiff was cooperative with treatment and had improved his GAF score to forty-five.[22]  However, the attending physician, Charles R. Kopekcy, M.D., reported that Plaintiff "expressed no motivation for sobriety . . . . and refused referral to rehabilitation services."[23]

Seven and a half years later, in January 2009, Glen E. McClure, Ph.D., ("Dr. McClure") saw Plaintiff for a consultative psychological examination in connection with his disability application.[24]  Plaintiff's complaints included insomnia, mood swing, headaches, nightmares, auditory and visual hallucinations,

---

[18]     See Tr. 268.

[19]     See Tr. 264, 268.

[20]     See Tr. 268.

[21]     See Tr. 272.

[22]     See Tr. 264-65.

[23]     See Tr. 264.

[24]     See Tr. 290-97.

paranoia, and depression.[25]   Plaintiff claimed that his prior psychiatric admissions had nothing to do with using alcohol or drugs, which Dr. McClure noted was inconsistent with Plaintiff's prior records showing that Plaintiff had been diagnosed with a drug-induced psychotic disorder.[26]   Dr. McClure found that Plaintiff tended to "minimize[] his substance abuse history while overestimating the degree of his deficits in other areas."[27] Dr. McClure also found that Plaintiff's self-report, his mother's report and the medical records were significantly inconsistent.[28]

Dr. McClure noted that Plaintiff was not motivated to obtain treatment.[29]   Though Plaintiff disclosed that he could not write, Dr. McClure found nothing in the records that showed that Plaintiff had intellectual limitations.[30]   Dr. McClure believed Plaintiff could "understand, remember and follow simple instructions,"[31] but, because Plaintiff had a low level of persistence, Dr. McClure could not determine what Plaintiff's abilities were beyond that point.[32]

### 2. Other Impairments

---

[25]   See Tr. 292.

[26]   See Tr. 292-93.

[27]   See Tr. 295.

[28]   Id.

[29]   Id.

[30]   Id.

[31]   Id.

[32]   Id.

5

In June 1996, Plaintiff went to the emergency room at Ben Taub Hospital for an ankle injury and had surgery to repair a fracture of his right distal fibula.[33]  In August 1997, Plaintiff was treated at the emergency room for a laceration to his right hand.[34]

In December 2008, Plaintiff saw Prem Nowlakha, M.D., ("Dr. Nowlakha"), in connection with his complaint of knee pain in his disability application.[35]  Notably, there is no record of a similar complaint that predated his application for benefits.  Plaintiff told Dr. Nowlakha that his knees swelled up and that he had aching pain that measured a ten on a scale of zero to ten.[36]  Dr. Nowlakha examined Plaintiff's knees and found no deformity and, after x-ray, he discerned no bone or soft tissue abnormality.[37]  Dr. Nowlakha found that Plaintiff was able to sit, stand, move and walk normally without assistance, walk on his heels and toes squat, hop, and tandem walk."[38]

## B. **Procedural History**

Plaintiff filed for disability benefits on September 18, 2008, claiming an inability to work since August 15, 2001, due to "mental-

---

[33]   See Tr. 248, 259, 261.

[34]   See Tr. 236.

[35]   See Tr. 149.

[36]   See Tr. 288.

[37]   See Tr. 285-89.

[38]   Id.

in balance [sic]" and "swelling in both knees/gout."[39]  Based on his
earnings records, Plaintiff remained insured through September 30,
2004.[40]   Thus,  the  relevant  period  for  determining  Plaintiff's
disability status for disability insurance benefits ("DIB") is
August 15, 2001, through September 30, 2004.[41]  The relevant period
for determining Plaintiff's supplemental security income ("SSI")
benefits is September 18, 2008, through November 20, 2009, the date
of the ALJ's decision.[42]

In  connection  with  his  application,  Plaintiff  completed  a
questionnaire  in  which  he  described  his  daily  activities.[43]
Therein,  he  reported  waking  up  at  4:00  a.m.  every  morning  and
walking  outside  because  he  could  not  fall  back  to  sleep.[44]   He
stated that he needed reminders to take care of personal needs and
grooming,  did  not  prepare  his  own  meals,  performed  no  household
chore  or  yard  work,  and  did  not  pay  bills.[45]   Plaintiff  did  not

---

[39]   See Tr. 149, 310, 312-14.

[40]   See Tr. 135, 139.

[41]    In order to qualify for [DIB], the claimant must prove that the onset
of his disability was on or before the date on which he was last insured.  Loza
v. Apfel, 219 F.3d 378, 394 (5th Cir. 2000).

[42]    The claimant cannot receive payment for [SSI] for any time prior to
the  application,  regardless  of  the  length  of  the  disability.   20  C.F.R.  §
416.335; Brown v. Apfel, 192 F.3d 492, 495 n.1 (5th Cir. 1999).

[43]   See Tr. 158-165. Other questionnaires completed by Plaintiff show
that his activity level remained constant after he filed for disability benefits.
See Tr. 148-154, 172-178, 182-188.

[44]   See Tr. 158.

[45]   See Tr. 160.

7

drive and relied on his mother for transportation.[46]  He shopped
once a week with her for food.[47]  Plaintiff reported that he watched
television "everyday all day."[48]  He attended church every Sunday
commenting, "I don't take part in anything."[49]

In January 2009, Dr. McClure completed a consultative
psychological examination in connection with Plaintiff's application
for benefits.[50]  Dr. McClure provisionally diagnosed Plaintiff's
mental health impairment as a depressive disorder NOS and assessed
his GAF score at sixty-one.[51]  In January 2009, a Psychiatric Review
Technique Form was completed by Leela Reddy, M.D. ("Dr. Reddy").[52]
Dr. Reddy determined that Plaintiff had a medically determinable
impairment of a depressive disorder but that this impairment was not
severe.[53]  Dr. Reddy found that Plaintiff had mild degrees of
limitation in activities of daily living, maintaining social
functioning, and maintaining concentration, persistence, or pace,
and no episodes of decompensation.[54]

---

[46]     See Tr. 161.

[47]     Id.

[48]     See Tr. 158.

[49]     See Tr. 162.

[50]     See Tr. 290-97.

[51]     See Tr. 296.

[52]     See Tr. 298-311.

[53]     See Tr. 298, 301.

[54]     See Tr. 308.

8

The Commissioner denied Plaintiff's application at the initial and reconsideration levels.[55] In May 2009, Plaintiff requested a hearing before an administrative law judge ("ALJ") of the Social Security Administration.[56] The ALJ granted Plaintiff's request and conducted a hearing on September 18, 2009.[57]  At the hearing on September 18, 2009, Plaintiff, Plaintiff's mother, and a vocational expert testified.[58]

**A. Plaintiff's Testimony**

Plaintiff reported auditory hallucinations had led to his past psychiatric hospitalizations.[59]  He testified that because he had no insurance, he was not seeing a psychologist or psychiatrist or taking any medications for his mental illness.[60]  Plaintiff also claimed he was financially unable to receive treatment for his swollen knees.[61]  He stated that he had screws and a plate in his right ankle dating from surgery in 1996.[62]  He recalled attending Alcoholics Anonymous meetings a few times.[63]  Plaintiff testified

---

[55]     See Tr. 77-84, 86-89, 95-87, 99-101.

[56]     See Tr. 102-3.

[57]     See Tr. 104-125.

[58]     See Tr. 39-76.

[59]     See Tr. 47.

[60]     See Tr. 47-48.

[61]     See Tr. 49.

[62]     See Tr. 50.

[63]     See Tr. 48.

that he lived in a trailer behind his mother's house as a result of frightening his mother in the past.[64]  He admitted that his mother had to remind him to bathe and that she brought him food.[65] He reported that he attended church once a week, watched television as a hobby, had a dog, and, when not sick, raked leaves in the yard.[66] He stated that he woke up at 3:00 a.m. every morning.[67]

Plaintiff stated that he could not read, which was a problem when he was employed as a truck driver because he could not find locations.[68] He reported that he had obtained his driver's license through an oral test, but that he did not drive anymore.[69] Plaintiff testified that he did janitorial work at Pizza Hut three hours a night, a few nights per week, for seven dollars an hour.[70] He did not have contact with the public at this job.[71]  Plaintiff did not know how much weight he could lift.[72]  He reported that he could not stand or walk for long periods of time, estimating thirty minutes

---

[64]    See Tr. 51-52.

[65]    See Tr. 49.

[66]    Id.

[67]    Id.

[68]    See Tr. 54-55.

[69]    See Tr. 46, 55.

[70]    See Tr. 46.

[71]    See Tr. 57.

[72]    See Tr. 59.

to an hour at the most.[73]  He had been in special education classes in school.[74]

Plaintiff remembered assaulting his nephew in 2004 and pleading guilty to that assault.[75]  Plaintiff testified that he had previously been married but was now divorced and had three children.[76]  He believed that problems with his marriage stemmed from his inability to get along with people and related an incident where he had poured ketchup on himself in front of his wife.[77] Plaintiff reported having trouble controlling his temper but stated that he thought "when [he] was on medication, . . . [he] was doing pretty good."[78]  Plaintiff testified that he had last consumed alcohol and illegal drugs five years ago.[79]

**B. Plaintiff's Mother's Testimony**

Plaintiff's mother, Ms. Johnson, stated that her son lived with her all his life except for the fourteen years when he was married.[80]  She testified that he was placed in special education

---

[73]    Id.

[74]    See Tr. 51.

[75]    See Tr. 52.

[76]    See Tr. 57.

[77]    See Tr. 57-58.

[78]    See Tr. 52.

[79]    See Tr. 48.

[80]    See Tr. 60.

classes from elementary school through high school.[81]  Ms. Johnson reported that Plaintiff was first hospitalized in 1993 because he had taken pills and had poured ketchup on himself and his bed.[82] Plaintiff did not live in her house, she said, because he frightened her when he arose in the middle of the night or had auditory or visual hallucinations.[83]

Ms. Johnson listed the following incidents as the most disturbing things she had seen Plaintiff do: he ran down the street naked; he dug up a stop sign, spray-painted his name on the back and replanted the it; he jumped through a glass window because he claimed to have heard voices; he ran into a neighbor's house claiming demons were after him; he ran after cars and jumped into the back of a pickup truck; he frequently laughed to himself; he burned a girlfriend's clothes; and he fell and broke his front teeth.[84]

Ms. Johnson testified that she had to remind Plaintiff to bathe and that she did not trust him to cook in her house.[85] She believed that Plaintiff would not be able to keep his job at Pizza

---

[81]    See Tr. 61-62.

[82]    See Tr. 62-63.

[83]    See Tr. 64.

[84]    See Tr. 64-67.

[85]    See Tr. 68.

Hut much longer because of conflicts with other employees.[86]   She
reported that Plaintiff's job at Pizza Hut involved cleaning up, but
that Pizza Hut "want[ed] to train him to ride and deliver pizzas,
but he's not capable of doing that."[87]   She believed that a family
member would have to take care of Plaintiff for the rest of his
life.[88]

## C. The Vocational Expert's Testimony

After hearing the foregoing testimony and reviewing the
Plaintiff's file, the vocational expert, Thomas King ("VE King"),
stated the only job performed by Plaintiff at the level of
significant gainful activity ("SGA") was as a truck driver.[89]   VE
King classified the job of truck driver as semiskilled and performed
at the medium exertional level.[90]

The ALJ posed the following hypothetical:

[A]ssume the existence of a hypothetical individual . .
. with the claimant's age, education and prior work
experience who is limited to performing unskilled,
simple, repetitive tasks which involve only occasional
contact with co-workers, supervisors and members of the
general public, and which do not involve occupational
exposure to drugs or alcohol. Would such an individual
be able to perform the claimant's past relevant work?[91]

---

[86]   See Tr. 68-69.

[87]   See Tr. 69.

[88]   See Tr. 68.

[89]   See Tr. 71.

[90]   Id.

[91]   Id.

Based on the record and Plaintiff's testimony, VE King found that Plaintiff could not perform his past relevant work as a truck driver.[92]  When the ALJ asked if there were jobs a person such as Plaintiff could perform, VE King asked if he was to consider any exertional limitations.[93]  The ALJ responded in the negative.[94]  VE King responded that there were jobs at the medium, unskilled work level that Plaintiff could perform.[95]  He gave three examples: dish washer, packager, and laundry worker.[96]

The ALJ then asked if any jobs could be performed by an individual who was precluded from having contact with the public.[97] VE King replied that the jobs of dish washer, packager, and laundry worker could be performed because those jobs did not involve interaction with the general public.[98]  The ALJ next asked how an individual such as Plaintiff would be affected if he were further limited to jobs that did not involve written instructions.[99]  VE

---

[92]     See Tr. 71-72.

[93]     See Tr. 72.

[94]     Id.

[95]     See Tr. 71-72.

[96]     See Tr. 72.

[97]     Id.

[98]     Id.

[99]     See Tr. 73.

King testified that none of those jobs cited - dish washer, packager, and laundry worker – required written instructions.[100]

Plaintiff's attorney asked VE King if his answer about the written instructions was based on objective materials or his own experience.[101]  VE Kind replied that his answer was based on his experience.[102]  Plaintiff's attorney then posed the following hypothetical:

> Now assume for me that the claimant's ability to concentrate is poor, his ability to persist and pace is poor; meaning his ability to sustain focused attention sufficiently long enough to permit the timely completion of tasks common found in work settings, would there be any jobs in the national economy such an individual could perform?[103]

VE King replied "based on those limitations, no."[104]  Plaintiff's attorney posed a second hypothetical:

> Assume that the hypothetical individual can not follow rules and/or regulations, and/or get along with his supervisors and co-employees, nor the public. Would the jobs that you've enumerated under the Administrative Law Judge's hypothetical still be available?[105]

VE King said they would not.[106]  On followup, VE King explained that the individual would need to be able to "follow work rules, get

---

[100]    Id.

[101]    Id.

[102]    Id.

[103]    Id.

[104]    Id.

[105]    Tr. 74.

[106]    Id.

along with co-workers and work with the public."[107] Plaintiff's attorney next asked if a hypothetical individual who would bathe once a week would be affected in maintaining employment.[108] VE King stated such an individual would not be able to maintain employment.[109] Finally, Plaintiff's attorney asked:

> [A]ssume that the claimant's behavior is unpredictable in that he may hit a person if he disagreed with the person, or he may holler or scream at the person, regardless as to whether or not it would be a co-employee, a supervisor, or the public...unpredictable when that would occur, but it would occur more than once or twice a week. How would that affect his ability to maintain employment in the national economy?[110]

VE King replied that such an individual would not be able to maintain work.[111]

On November 20, 2009, the ALJ issued an unfavorable decision.[112] Plaintiff appealed the ALJ's decision to the Appeals Council on December 11, 2009.[113] The Appeals Council denied Plaintiff's request for review on July 23, 2010.[114] Having exhausted

---

[107]    Id.

[108]    Id.

[109]    Id.

[110]    Tr. 75.

[111]    Id.

[112]    See Tr. 23-38.

[113]    See Tr. 19-21.

[114]    See Tr. 19-21, 23-38.

all administrative remedies,[115] Plaintiff brought this civil action for review of the Commissioner's decision.[116]

## II. Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: 1) substantial evidence in the record supports the decision; and 2) the ALJ applied proper legal standards in evaluating the evidence. Walters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002); Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999). In addition to the initial disability determination, the Social Security Administration periodically reviews continued entitlement to disability benefits. See 20 C.F.R. § 404.1594(a).

## A. Substantial Evidence

The widely accepted definition of "substantial evidence" is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion," Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000). It is "something more than a scintilla but less than a preponderance." Id. The Commissioner has the responsibility of deciding any conflict in the evidence. Id. If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and

---

[115]    See Harper v. Brown, 813 F.2d 737, 739 (5th Cir. 1987), for a summary of the administrative steps a disability claimant must take in order to exhaust her administrative remedies.

[116]    Doc. 1., Pl.'s Compl.

17

this court must affirm. 42 U.S.C. § 405(g); <u>Selders v. Sullivan</u>, 914 F.2d 614, 617 (5th Cir. 1990).

The court should overturn the Commissioner's decision only if no credible evidentiary choices or no medical findings exist to support it. <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1988). In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment. <u>Brown</u>, 192 F.3d at 496. In other words, the court is to defer to the decision of the Commissioner as much as possible without making its review meaningless. <u>Id.</u>

**B.  <u>Legal Standard</u>**

In order to obtain disability benefits, a claimant bears the ultimate burden of proving he is disabled within the meaning of the Act. <u>Wren v. Sullivan</u>, 935 F.2d 123, 125 (5th Cir. 1991). Under the applicable legal standard, a claimant is disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a); <u>see also</u> <u>Greenspan v. Shalala</u>, 38 F.3d 232, 236 (5th Cir. 1994). The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings.

42 U.S.C. § 423(d)(3), (d)(5)(A); see also Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provided that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to an impairment listed in Appendix 1 of the regulations [regulatory medical listings ("Listings")[117]] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform his previous work as a result of his impairment, then factors such as his age, education, past work experience, and residual functional capacity ("RFC") must be considered to determine whether he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. § 404.1520. By judicial practice, the claimant bears the burden of proof on the first four of the above steps, while the Commissioner bears it on the fifth. Crowley v. Apfel, 197 F.3d 194, 198 (5th Cir. 1990); Brown, 192 F.3d at 498. If the Commissioner satisfies his step-five burden of proof, the burden shifts back to the claimant to prove he cannot perform the work suggested. Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991). The analysis stops at

---

[117]   20 C.F.R. Pt. 404, Subpt. P., App. 1.

any point in the process upon a finding that the claimant is disabled or not disabled. Greenspan, 38 F.3d at 236.

### III.   Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits. Plaintiff contends the ALJ did not follow proper legal procedures and that the ALJ's decision is not supported by substantial evidence. Specifically, Plaintiff argues that the ALJ failed to evaluate Ms. Johnson's testimony, that the ALJ's credibility findings were not supported by substantial evidence, and that the ALJ's step-five finding that Plaintiff could perform the jobs of dish washer, packager, and laundry worker was directly contradicted by Plaintiff's nonexertional limitation of no written instructions. Defendant points out that substantial evidence supports both the ALJ's credibility analysis, including the ALJ's treatment of Ms. Johnson's testimony, and the ALJ's step five determination. The court begins with a summary of the ALJ's decision and then considers the parties' summary judgment arguments.

### A.   ALJ's Decision

In his November 2009 decision, the ALJ found that Plaintiff met the requirements for insured status on the alleged onset date of disability and continuing though September 30, 2004.[118] The ALJ also found that Plaintiff had not engaged in substantial gainful

---

[118]   See Tr. 28.

activity since August 15, 2001,[119] and that Plaintiff had severe impairments of major depression, personality disorder NOS, and history of polysubstance abuse.[120] The ALJ found that Plaintiff's mildly overweight condition and alleged knee and ankle conditions were not severe impairments because they only slightly limited Plaintiff's ability to perform basic work activities.[121]

The ALJ determined that none of Plaintiff's impairments, either individually or in combination, met any Listing.[122] In reviewing the Listing criteria, the ALJ determined that the evidence showed that Plaintiff had moderate restrictions in activities of daily living, moderate difficulties with concentration, persistence, or pace, and marked difficulties in social functioning.[123] The ALJ found that Plaintiff had experienced one to two episodes of decompensation, each of extended duration.[124] However, the ALJ noted that since Plaintiff's August 2001 hospitalization, there was no objective medical evidence of treatment and no indication of ongoing disabling psychopathology.[125]  Because Plaintiff did not have at least two marked limitations or one marked limitation and repeated

---

[119]    See id.

[120]    See Tr. 28-29.

[121]    See Tr. 29.

[122]    See Tr. 30.

[123]    See id.

[124]    See id.

[125]    See id.

episodes of decompensation, the ALJ found Plaintiff did not meet the "paragraph B" criteria of Listing 12.04.[126] The ALJ also determined that because no evidence showed that Plaintiff required a supportive living arrangement at any time during the relevant period under consideration, Plaintiff did not meet the "paragraph C" criteria of Listing 12.08.[127]

After reviewing the record, the ALJ found the Plaintiff had the RFC:

> to perform a full range of work at all exertional levels but with the following nonexertional limitations: unskilled work requiring only simple repetitive tasks, occasional contact with co-workers and supervisors, no contact with the public, no occupational exposure to drugs or alcohol, and no written instructions.[128]

The ALJ found that Plaintiff's alleged symptoms could reasonably be caused by his medically determinable complaints. However, the ALJ also found that regarding "the intensity, persistence and limiting effects of these symptoms," Plaintiff's claims were not fully credible.[129] Although Plaintiff said he was unable to work because of his ongoing symptoms of mental illness, the ALJ noted that the record showed "no treatment after August 2001 or any objective indication of treatment for an ongoing, potentially-disabling level

---

[126]    See id.

[127]    See Tr. 31.

[128]    Tr. 31.

[129]    Tr. 32.

of psychopathology."[130] The ALJ also noted that Plaintiff's significant psychiatric history occurred prior to the relevant period and "appear[ed] to be driven by his history [of] substance abuse and non compliance with his medications."[131] The ALJ further determined that Plaintiff had a history of noncompliance with prescribed treatment as evidenced by his August 2001 hospitalization, in which Plaintiff was not compliant with his medications, was not motivated to be sober at discharge, and refused to be referred to rehabilitation services.[132]

Addressing Plaintiff's testimony that he had not sought treatment because he had no money or medical insurance, the ALJ found no record evidence that Plaintiff had actually attempted to obtain access to medical treatment through "every means possible."[133] The ALJ noted that contrary to Plaintiff's assertions that Fort Bend County did not provide medical care for indigent residents, Fort Bend County, like all Texas counties, was required to provide indigent health services.[134] As a result, the ALJ found no support

---

[130]   Id.

[131]   Id.

[132]   See id.

[133]   Tr. 32-33.

[134]   See Tr. 33.

for Plaintiff's subjective claims that he could not obtain medical treatment.[135]

The ALJ rejected Dr. McClure's opinion that there was no evidence that Plaintiff suffered from significant intellectual deficits but in that instance credited Plaintiff's assertions that he had minimal reading skills by including a restriction in the RFC of no written instructions.[136]  The ALJ found Plaintiff was unable to perform his past relevant work as a truck driver because it involved semi-skilled work.[137]

Since Plaintiff's ability to perform work at all exertional levels was compromised by his nonexertional limitations,[138] the ALJ adopted the testimony of the vocational expert that a hypothetical individual with Plaintiff's RFC and nonexertional limitations would be able to perform the occupations of dish washer, packager, and laundry worker, and the ALJ found Plaintiff not disabled.[139]

## B. **Plaintiff's Motion**

Plaintiff argues in his motion for summary judgment that the ALJ's credibility findings were not supported by substantial evidence. Plaintiff also argues that the ALJ failed to follow the

---

[135]    See id.

[136]    See id.

[137]    See id.

[138]    20 CFR Pt. 404, Subpt. P., App. 2, Medical-Vocational Guidelines § 204.00.

[139]    See Tr. 34.

24

nonexertional limitation of no written instructions when performing step-five of the disability claims analysis.

### 1. Failure to Consider Ms. Johnson's Testimony

Plaintiff argues that the ALJ committed error when he failed to take into account the testimony of Ms. Johnson without giving a reason for rejecting her testimony.  Plaintiff cites several Ninth Circuit cases in support of a standard in which an ALJ must give "germane reasons" for rejecting "lay testimony," and that the ALJ's failure to do so is harmful error unless a reasonable ALJ would reach the same conclusion when considering said testimony.[140] Plaintiff also supports his claim with several statements made by Ms. Johnson at the ALJ hearing in which Ms. Johnson detailed "the most atrocious"[141] things she had seen her son do.[142]

Witness testimony such as Ms. Johnson's is competent evidence that a claimant may provide to support evidence of his alleged symptoms. 20 C.F.R. § 404.1513(d)(4),(e).  The ALJ may not disregard such testimony "about the effect the symptoms have on [an individual's] ability to work . . . solely because [that testimony is] not substantiated by objective medical evidence."  Social

---

[140]    Plaintiff refers to a standard created by Ninth Circuit cases <u>Nguyen v. Chater</u>, 100 F.3d 1462 (9th Cir. 1996), and <u>Stout v. Comm'r, Social Sec. Admin.</u>, 454 F.3d 1050 (9th Cir. 1996). Doc. 17, Pl.'s Mot. For Summ. J., p. 16.

[141]    Tr. 66.

[142]    <u>See</u> <u>id</u>. (running around the street naked, digging up the stop sign, jumping through a glass balcony, running and hiding in a closet with demons after him, jumping after moving cars, laughing and talking to himself, and burning a girlfriend's clothes).

Security Ruling ("SSR")[143] 96-7p, 1996 SSR LEXIS 4, at *2-3. The ALJ must support his determination of credibility with "specific reasons for the finding . . . supported by the evidence in the case record" and the ALJ should make clear how much weight was given to statements and why the ALJ gave that weight to the statements. Id. at *3-4. The court gives deference to the ALJ as the factfinder if the record substantially supports the evaluation of the credibility of subjective complaints. Hollis v. Bowen, 837 F.2d 1378, 1384 (5th Cir. 1988); Villa v. Sullivan, 895 F.2d 1019, 1024 (5th Cir. 1990).

The portions of Ms. Johnson's testimony that concern events prior to August 15, 2001, are outside the relevant period of disability and were properly disregarded. See Loza, 219 F.3d at 394; SSR 83-20, 1983 SSR LEXIS 25, at *3. Though the ALJ did not directly refer to Ms. Johnson by name in the decision, the ALJ specifically noted that Plaintiff's "significant psychiatric history is remote in nature and appears to be driven by his history [of] substance abuse and non compliance with his medications."[144]

The ALJ credited portions of Ms. Johnson's testimony regarding her son's inability to live by himself, needing reminders to bathe, and her not trusting him to cook in her house.[145] However, in other

---

[143] The court notes that SSA rulings are not binding on the court but may be consulted for explanation of a statute that provides little guidance. Myers v. Apfel, 238 F.3d 617, 620.

[144] Tr. 32.

[145] Id.

instances, Ms. Johnson's and Plaintiff's assertions as to the disabling effect of Plaintiff's symptoms directly conflicted with portions of Plaintiff's medical record, as well as the opinions of Dr. McClure and Dr. Nowlakha.  Conflicts between subjective evidence and medical evidence are to be resolved by the ALJ and may be disturbed by a reviewing court only if they are not supported by substantial evidence.  See Hollis, 837 F.2d at 1385.

The ALJ disagreed with Dr. McClure's opinion that Plaintiff did not have severe mental impairments based on other evidence in the record.[146]  The ALJ credited portions of Plaintiff's testimony by including a restriction of no written instructions in the RFC despite Dr. McClure's not finding significant intellectual defects in Plaintiff.[147] The ALJ also credited testimony about Plaintiff's drug history, and claimed inability to interact with co-workers and the public in assessing the RFC.[148] The ALJ considered the contradictory evidence between Dr. McClure's findings and Plaintiff's statements with regards to concentration, persistence or pace, and resolved them against Plaintiff, in part, because Plaintiff was capable of engaging in activities such as watching

---

[146]   Tr. 28.

[147]   Tr. 33.

[148]   Tr. 32-33.

27

television, washing dishes, raking leaves, attending church, and working part time at Pizza Hut as a cleaner.[149]

Plaintiff refers to the Ninth Circuit standard of review for harmless error in regards to consideration of lay witness testimony, a standard that has never been adopted in the Fifth Circuit.[150] However, Ms. Johnson's testimony does not support a different conclusion in this case because Ms. Johnson's testimony, while more detailed than Plaintiff's, did not add any additional events not testified by Plaintiff.  The incidents to which Plaintiff points as not considered by the ALJ were either mentioned previously by Plaintiff in his testimony or were contained in the medical records submitted by Plaintiff.  Further, most of Plaintiff's past acts that Ms. Johnson mentioned predate the relevant time period in this case. Given these circumstances, the court finds that the ALJ's decision is supported by substantial evidence of record.

### 2. Inability to Afford Treatment

Plaintiff takes issue with the ALJ's finding that Plaintiff was noncompliant with treatment and therefore could not be found disabled within the meaning of the Social Security Act.[151]  Plaintiff

---

[149]   Tr. 31-32.

[150]   Under such a standard, an ALJ commits harmful error with regards to lay testimony if a reasonable ALJ who fully credits that lay testimony would come to a different conclusion. Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1056 (9th Cir. Or. 2006). Even if such a standard were to apply in the Fifth Circuit, there is substantial evidence that a reasonable ALJ who fully credited Ms. Johnson's testimony could come to the same decision that the ALJ in this case did.

[151]   Doc. 17, Pl. Mot. for Summ. J., p. 24.

28

argues while that he provided testimony that he could not afford treatment, there is no evidence in the record of an "actual hospital or treating facility" providing indigent services.[152] Plaintiff also argues that the ALJ "failed to follow a proper noncompliance analysis set out in SSR 82-59."[153]

A claimant must be unable to obtain treatment for a condition disabling in fact to be disabling in law. <u>Lovelace v. Bowen</u>, 813 F.2d 55, 59 (5th Cir. 1987). As the ALJ specifically noted, an inability to pay does not automatically equal a finding of disabled. <u>See</u> <u>Harper v. Sullivan</u>, 887 F.2d 92, 95 (5th Cir. 1989). Among the requirements under SSR 82-59 is that a determination must be made as to whether a failure to follow prescribed treatment is justifiable. SSR 82-59, 1982 SSR LEXIS 25, at *11. A plaintiff's claim of an inability to afford treatment as a justifiable reason for failing to follow prescribed treatment is only allowed "where such treatment is not reasonably available in the local community." <u>Id.</u> at *9-10. A plaintiff must explore "all possible resources," and "contacts with such resources and the claimant's financial circumstances must be documented." <u>Id.</u> at *10.

Here, Plaintiff provided no documentation to show he had pursued treatment options or had been turned away from treatment because of indigency. <u>Id.</u> at *10; <u>Taylor v. Bowen</u>, 782 F.2d 1294,

---

[152]   <u>Id.</u> at 25.

[153]   <u>Id.</u> at 25-26.

1298 (5th Cir. 1986). Because there is no evidence beyond Plaintiff's assertions, the court finds no reason to disturb the ALJ's credibility finding regarding Plaintiff's alleged inability to obtain treatment.

**3. Conflict between the Dictionary of Occupational Titles and the Nonexertional Limitations**

Finally, Plaintiff contends that the ALJ, though he had found that Plaintiff had a nonexertional limitation of "no written instructions," erred in finding that Plaintiff could perform the jobs of dish washer, packager, and laundry worker because the Dictionary of Occupational Titles ("DOT") requirements for those jobs include provisions for written instructions.

Plaintiff gives no authority to support his argument beyond a listing of purported DOT requirements and case law describing the DOT requirements. For the job of dish washer, Plaintiff cites the job description of kitchen helper because, according to an unpublished district court case, the job of kitchen helper "appears to include the duties of a dish washer."[154] It is unclear to which DOT definition Plaintiff is referring for the job of laundry worker, as there are several types of laundry workers listed in the DOT. Plaintiff cites no DOT number for the job of hand packager.

---

[154]   The case Plaintiff cites in support of this proposition dealt with the plaintiff's ability to reach, and did not involve an inability to read written instructions. <u>Epperson v. Astrue</u>, 2009 WL 1313325 at *4 (E.D. Ky. May 12, 2009).

Nevertheless, Plaintiff argues that all three of the jobs cited by VE King require Level 2 reasoning, which is defined as the ability to "carry out detailed but uninvolved written or oral instructions." DOT 317.687-010.[155]   The court notes that VE King did not provide DOT numbers when he named these jobs.

To decide an alleged conflict between vocational expert testimony and a DOT description, the court should follow a middle ground "in which neither the DOT nor the vocational expert testimony is per se controlling," and focus on the larger issue of whether substantial evidence supports the Commissioner's finding that this person can do these particular jobs.  Carey, 230 F.3d at 145-147 (5th Cir. 2000). The ALJ may rely on the vocational expert's testimony if the

> hypothetical question . . . can be said to incorporate reasonably all disabilities of the claimant recognized by the ALJ, and the claimant or his representative is afforded the opportunity to correct deficiencies in the ALJ's question by mentioning or suggesting to the vocational expert any purported defects in the hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question).

Bowling, 36 F.3d at 436. Plaintiff may not scan the record for perceived inconsistences between the testimony of the vocational expert and the DOT if the issue was not raised at the ALJ hearing.

---

[155]   The case from which Plaintiff argues that level 2 reasoning is needed for the jobs of laundry worker and hand packager also stated that "the Level 2 reasoning definition is an upper limit across all jobs in the occupational category, not a requirement of every job within the category," and noted that DOT job descriptions are not to be strictly interpreted. Moore v. Astrue,623 F.3d 599, 604 (8th Cir. 2010).

Carey, 230 F.3d at 146-47.   Additionally, "DOT job descriptions should not be given a role that is exclusive of more specific vocational expert testimony with respect to the effect of an individual claimant's limitations on his or her ability to perform a particular job," as the vocational expert knows the requirements and skills needed for a particular occupation. Id. at 145 (citing Fields v. Bowen, 805 F.2d 1168, 1170 (5th Cir. 1986)).

Here, the ALJ's hypothetical incorporated Plaintiff's impairments and limitations of occasional contact with co-workers and supervisors, no contact with the general public, no exposure to drugs and alcohol, and unskilled, simple, and repetitive tasks. This hypothetical reasonably included "all disabilities of the claimant recognized by the ALJ." Bowling, 36 F.3d at 436. Plaintiff's attorney had the opportunity to present his own hypothetical questions to VE King, and Plaintiff raised no issues with regards to written instructions. Id.; Boyd v. Apfel, 239 F.3d 698, 707 (5th Cir. 2001).

Though neither the ALJ nor VE King gave specific DOT entries for the jobs of dish washer, laundry worker, and packager, the ALJ specifically asked VE King whether these jobs involved written instructions.[156] VE King stated these jobs did not require written instructions and that his testimony was consistent with the DOT.[157]

---

[156]   Tr. 72.

[157]   Id.

The court notes that "the DOT is not comprehensive, in that it cannot and does not purport to include each and every specific skill or qualification for a particular job," and the ALJ is allowed to rely on a vocational expert's testimony to determine the skills required to perform a particular job. Carey, 230 F.3d at 145 (citing Fields, 805 F.2d at 1171).

Plaintiff had the burden to prove he could not perform the jobs set out by the vocational expert. Crowley, 197 F.3d at 198. Plaintiff has presented no evidence that he could not perform the jobs of dish washer, packager, or laundry worker. Therefore, the ALJ property determined that the Plaintiff was not to be disabled under the Act.

Accordingly, the court **DENIES** Plaintiff's summary judgment motion.

## C. Defendant's Motion

Defendant also moves for summary judgment. Defendant asserts in his response that the ALJ's decision should be affirmed because the ALJ properly determined Plaintiff was never under a disability.

The court recognizes the seriousness of Plaintiff's medical conditions.  However, the court must review the record with an eye toward determining only whether the ALJ's decision is supported by more than a scintilla, but less than a preponderance of evidence. See Carey, 230 F.3d at 135.  The court finds more than a scintilla of evidence in support of the ALJ's decision.  Therefore, the court

cannot overturn the decision of the ALJ, who is given the task of weighing the evidence and deciding disputes.  <u>See</u> <u>Chambliss v. Massanari</u>, 269 F.3d 520, 522 (5th Cir. 2001); <u>Carrier v. Sullivan</u>, 944 F.2d 243, 247 (5th Cir. 1991).

For the reasons stated above, the court finds Defendant satisfied his burden.  As a result, the ALJ's decision finding Plaintiff not disabled is supported by substantial record evidence. The court also agrees with Defendant that the ALJ applied proper legal standards in evaluating the evidence and in making his determination.  Therefore, the court **GRANTS** Defendant's summary judgment motion.

### IV. Conclusion

Based on the foregoing, the court **GRANTS** Defendant's Motion for Summary Judgment and **DENIES** Plaintiff's Motion for Summary Judgment.

**SIGNED** at Houston, Texas, this <u>8th</u> day of March, 2011.

Nancy K. Johnson
United States Magistrate Judge

34